**IN UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **JACQUELINE WILSON**<br>**801 Broderick Drive**<br>**Oxon Hill, MD 20745**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**MARY JO WHITE, CHAIR**<br>**U.S. SECURITIES AND EXCHANGE COMMISSION**<br>**100 F Street, NE**<br>**Washington, DC 20549**<br><br>***Defendant.*** | **)** | **Case No.:**<br><br>**Jury Trial Demand** |

**COMPLAINT**

Plaintiff Jacqueline Wilson, by and through counsel, hereby files this Complaint for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a., against Defendant Mary Jo White, Chair, U.S. Securities and Exchange Commission.

**Jurisdiction and Venue**

1. This court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, 42 U.S. C. § 2000e *et seq.*, and 29 U.S.C. § 633a.

2. Plaintiff has exhausted all administrative remedies prior to filing suit.

3. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

**Parties**

4. Plaintiff Jacqueline Wilson (hereinafter "Plaintiff" or "Wilson") is an African American female and was fifty-three (53) years old at the time of the events giving rise to this Complaint.

5. Defendant Mary Jo White (hereinafter "Defendant" or the "Agency") is the Chair of the U.S. Securities and Exchange Commission, an administrative agency of the United States government and an "employer" within the meaning of the statutes under which Plaintiff brings her claims.

**Factual Allegations**

6. Plaintiff Jacqueline Wilson began employment at the U.S. Securities and Exchange Commission in 2008 as a Supervisory Auditor, SK-17, and her title was Assistant Inspector General for Audit. Plaintiff Wilson was hired at the SEC into a professional auditor series, 0511, which requires certain courses and educational levels to serve in the series. Plaintiff Wilson holds a Master's degree in Accounting. She was recruited for the position by the Inspector General, both because of her education and experience and because the Agency did not have any African Americans in senior positions within the Office of Inspector General (OIG) and had been under pressure to hire minorities into professional series positions in the Agency. Plaintiff was issued a retention bonus to remain employed at the Agency.

7. The SEC Office of Inspector General, pursuant to the Inspector General Act of 1978, as amended, is an independent office within the Agency. The Inspector General Act requires each OIG to have one Assistant Inspector General for Audit, and one Assistant Inspector General for Investigations. As the Assistant Inspector General for

Audit, Plaintiff Wilson supervised the audit function, including a staff of up to seven employees and contractors, and was responsible for making sure that audits were supported, and provided guidance to the staff and the Inspector General on audit matters.

8. Plaintiff Wilson performed her job in an exceptional manner. From 2008 until 2013, Plaintiff Wilson received the highest performance ratings available to her; she consistently received ratings of exceeds expectations and greatly exceeds expectations. Under Plaintiff Wilson's supervision, the OIG's Office of Audit was subjected to a mandatory peer review by an Office of Inspector General from another federal agency. The mandatory peer review completed in August 2012 found that the SEC OIG Office of Audit, was a well performing OIG audit organization.

9. Plaintiff Wilson began reporting to Carl Hoecker, a Caucasian male, in February 2013. Hoecker immediately began treating Plaintiff Wilson with hostility when he began employment at the SEC.

10. Prior to reporting to Hoecker, Plaintiff Wilson was required to provide testimony in two investigations of staff within OIG. One of the investigations involved the conduct of an attorney in the OIG, Mary Beth Sullivan. Sullivan was named in two separate investigations for which wrongdoing was found on her part. She was named in the Gary J. Aguirre case and the David Weber case. Plaintiff Wilson gave testimony in the Weber case to the U.S. Postal Service Office of Inspector General regarding Sullivan. The USPS OIG investigation found that Sullivan and the former Acting Inspector General of the SEC, Noelle Maloney, had knowledge or suspicion of misconduct within the OIG, and failed to report this misconduct or take action to address this misconduct. The

misconduct involved some of the most sensitive investigations conducted by the SEC, including the Bernard L. Madoff investigation and the R. Allen Stanford investigation.

11. On February 12, 2013, Plaintiff Wilson met with Hoecker; Mary Beth Sullivan, Counsel to the Inspector General (SK-16); Craig Welter, Attorney, Senior Investigator (SK-16); and Raphael Kozolchyk, Investigator (SK-13). During the meeting, Hoecker stated he had requested a binder of information from each person present at the meeting and had not received Plaintiff Wilson's binder, and he sternly stated "Jacky, I'll deal with you later." Hoecker asked Plaintiff Wilson to remain after the meeting, and then proceeded to scold her on why she had not turned in the binder. In fact, Plaintiff Wilson had completed an extensive briefing binder which contained information on the OIG as well as the SEC's functions, programs and operations.

12. On February 20, 2013, Hoecker held a meeting with Plaintiff Wilson, Sullivan, Welter, Kozolchyk and Congressional Relations Counsel, Roberta Raftovich. During the meeting, Raftovich commented that a contract Plaintiff Wilson oversaw as a contracting officer representative (COR) had come up on a list from OFM as needing closure because the contract had ended. Hoecker proceeded to ream Plaintiff Wilson out in front of her subordinate staff regarding neglecting her responsibility as a COR, and her responsibility to request closures regarding what the SEC policy or practices were, and stated in a demeaning and degrading manner, "that's why you make the big bucks." Plaintiff Wilson had always complied with SEC policy and practices in carrying out her COR responsibilities, and in fact had submitted the closure request four months earlier in October 2012.

13. On February 25, 2013, Hoecker held a meeting with Plaintiff Wilson, Sullivan, Welter, Kozolchyk and Congressional Relations Counsel, Roberta Raftovich. During the meeting, each attendee provided a report on their work areas. When it was time for Plaintiff Wilson to speak, Hoecker was harsh and agitated in his tone. Hoecker did not understand the audit process and verbally abused and humiliated Plaintiff Wilson to demonstrate his authority over Plaintiff Wilson in front of her subordinates.

14. On March 1, 2013, Plaintiff Wilson and audit staff met with Hoecker regarding the status of a presentation. Plaintiff Wilson informed Hoecker that the report could contain sensitive information and if so, it may be necessary to go through a seriatim process. Hoecker responded by snapping at Plaintiff Wilson and reaming her out in front of her staff. Plaintiff Wilson was so distraught after the meeting that she returned to her office and cried. For a period of time after this meeting, she could not sleep or eat and began seeing a therapist.

15. On March 8, 2013, Plaintiff Wilson was called to a meeting with Hoecker in his office. Once she arrived, Hoecker informed her that the meeting was a "coaching session" and that she "wasn't all that people said [she] was" and "you're no Marlo Freedman," Plaintiff Wilson's male predecessor. Hoecker accused Plaintiff Wilson of acting unprofessionally at a meeting with a representative of the Senate Banking Committee because at the end of the meeting with staff, Plaintiff Wilson stated that the auditor did all the work and she just "fixed the report" by editing it. Hoecker claimed Plaintiff Wilson's statement degraded the auditor and he ordered her to apologize to the auditor. Plaintiff Wilson responded that she did not believe it was necessary for her to apologize to the auditor because she did not believe her comment was unprofessional or

that the auditor was offended by her comments.  Hoecker became furious and began talking in a loud voice at Plaintiff Wilson as he was writing.  Plaintiff Wilson agreed to talk to the auditor.

16.     After Plaintiff Wilson agreed to talk to the auditor, Hoecker then proceeded to attack Plaintiff Wilson for instances he claimed that she had acted unprofessionally in meetings.  He complained that she thanked staff for their work after Hoecker had thanked staff, and reprimanded Plaintiff Wilson for responding to a question from a junior staff member at a meeting.  Plaintiff Wilson was so upset that she questioned Hoecker about whether he had a personal vendetta against her and what had she done to deserve the treatment he was subjecting her to.  Plaintiff Wilson informed Hoecker that she was the senior person in OIG and Hoecker treated her differently than Caucasian staff.  She stated to Hoecker if their roles were reversed and he was the only Caucasian among a staff of African American employees, how would he feel.  Plaintiff Wilson demanded fair treatment.

17.     On March 9, 2013, Plaintiff Wilson spoke to the auditor as directed by Hoecker.  The auditor stated to Plaintiff Wilson that he had not spoken to anyone about any comments that she made at the meeting in question, and did not recall Plaintiff Wilson stating that she fixed the auditor's report, and would not have been offended because they worked together on the audit and the report.

18.     Between March and June 2013, Plaintiff Wilson issued seven reports and worked on several projects, and worked with Hoecker on two Congressional requests.  During this period, Hoecker was rude to Plaintiff Wilson, and made snide comments to her during meetings, and subjected a Korean auditor to the same treatment.

19. In June 2013, Hoecker advertised the Deputy Inspector General position and selected Mary Beth Sullivan as the Deputy Inspector General. The selection was made despite the fact that Sullivan had been named as a key person in the David Weber investigation conducted by the U.S. Postal Service, and that the investigation concluded that Sullivan failed to report known information to the proper authorities, and Plaintiff Wilson had provided information against Sullivan in the investigation. Plaintiff Wilson had grave concerns about reporting to Sullivan because Sullivan made discriminatory comments about her and other minority employees.

20. On June 19, 2013, Plaintiff Wilson met with Hoecker and Sullivan, Welter, and Kozolchyk. Kozolchyk had been previously identified in the Weber investigation and admitted that he lied and was consequently suspended without pay. During the meeting, Hoecker stated that he was upset because no one stepped up to lead the Congressional request. At this point, all attendees in the meeting looked at Plaintiff Wilson. Plaintiff Wilson inquired why everyone was looking at her and said the Congressional request was not her responsibility. Immediately after the meeting, Plaintiff Wilson requested a meeting with Hoecker. During this meeting, she informed him that he was biased against her, and blaming her for not taking the lead on the Congressional request was another example of his bias. Plaintiff Wilson requested a transfer to another office. Hoecker denied that he was treating Plaintiff Wilson differently any more, but did not respond when Plaintiff Wilson told Hoecker that even her staff commented that he was bullying her.

21. On June 19, 2013, Plaintiff Wilson spoke to Erica Williams, Deputy Chief of Staff, SEC-Office of the Chair and informed her that she felt that she was working in a

hostile work environment and she wanted assistance in finding another job. Williams responded that she would ask Lacy Dingham, the OHR Director to contact her. Dingham later contacted Plaintiff Wilson and offered a demotion to another office, which Plaintiff Wilson rejected.

22. In August 2013, Hoecker hired Paul Brian Crane, a Caucasian male, as the Assistant Inspector General. Hoecker informed Plaintiff Wilson that he did not interview Crane because he was Crane's supervisor at Treasury and he was highly qualified for the job. Shortly after he began employment, Crane began meeting most days with Hoecker in his office to eat breakfast. Many days they also met for lunch. Hoecker began taking Crane to meetings with the SEC Chair and Commissioners. Hoecker also began sending Sullivan and Welter to monthly CIGIE meetings. Plaintiff Wilson was not given these opportunities.

23. Sullivan became Plaintiff's supervisor in August 2013. Sullivan began a practice of requiring Plaintiff Wilson to report on a daily basis all of her activities and randomly appearing at Plaintiff's office to meet with her regarding the status of her work, and sent her an email requiring that Plaintiff Wilson copy her on all draft work products that go outside the Office of Audits. Sullivan, who is an attorney, had no training or experience in audit and accounting functions. Sullivan singled Plaintiff Wilson out with these requests and emails and did not require Crane to send her drafts of his work product.

24. From September 2013 through November 2013, Sullivan increased her harassment of Plaintiff Wilson. On September 9, 2013, Sullivan notified Plaintiff that she was required to attend a writing course. On September 10, 2013, Sullivan sent Plaintiff Wilson an email demanding that she assess the OMB requirements regarding the

Government Charge Card Abuse Prevention Act of 2012 and then interpret the requirements, when a subordinate staff member, Welter, had already rendered a verbal opinion on the Act.  On September 19, 2013, Sullivan asked to meet with Plaintiff Wilson and when Plaintiff Wilson arrived at the meeting she observed that Crane was on one knee beside Sullivan as she typed on her computer.  Later that day, Plaintiff Wilson was issued a memorandum which stated that the work produced by Plaintiff's office would be overseen by a senior leadership team consisting of the IG, the DIG, the AIGI and the Acting Counsel for the IG.  Crane and Welter were not required to have their work overseen by a senior leadership team. Upon receipt of the memorandum, Plaintiff Wilson had an anxiety attack and required treatment and medication by the Agency nurse.

25. On September 23, 2013, Sullivan and Hoecker required Plaintiff Wilson to complete a training form 182 for attendance at the FAEC conference.  The conference is attended by other senior audit directors and the training is held at the GPO's offices in Alexandria, Virginia.  Sullivan and Hoecker required Plaintiff Wilson to leave the training before its conclusion and return to the office for a staff meeting.  Plaintiff Wilson left training and returned to the staff meeting, and learned that she was the only person required to attend the meeting in person, as several people called into the staff meeting.

26. In October 2013, Plaintiff Wilson contacted Jeff Heslop, the SEC's Chief Operating Officer and asked to be transferred to the Office of the Chief Operating Officer.  Heslop later informed Ms. Wilson that he would find her work in OHR.  In January 2014, Plaintiff Wilson was contacted by Travis Elliot, OHR's employee relations' attorney, who inquired if Plaintiff Wilson would accept a 90 day detail to OHR, as a lateral transfer.

27. On November 15, 2013, Plaintiff Wilson contacted the Agency's EEO office to file a discrimination complaint.

28. Plaintiff Wilson requested to use three weeks of use or lose leave in August 2013. In December 2013, Sullivan attempted to prevent Plaintiff Wilson from using the leave, but her decision was not supported by OHR.

29. Hoecker attempted to force Plaintiff Wilson out of her position. Specifically, he requested authorization to post a position that had the same duties and responsibilities of Plaintiff Wilson's position, even though there was not enough work for another full time position like Plaintiff Wilson's, and Plaintiff Wilson then requested a transfer from the office. Once Hoecker received approval to post the position which was identical to Plaintiff Wilson's job, he advertised the position and determined that she was not qualified to be interviewed, even though Plaintiff Wilson's name was on the best qualified certification list. Hoecker hired a substantially younger Caucasian female, Rebecca Sharek, with work and educational backgrounds similar to Plaintiff Wilson, but at a salary $30,000 greater than Plaintiff's salary. Ms. Sharek assumed full responsibility for all of Plaintiff Wilson's former duties, but was given the title of Deputy Inspector General for Audit, and Plaintiff Wilson was placed on detail to OHR.

30. In January 2014, Plaintiff Wilson received her annual performance appraisal written by Sullivan. Her average rating score dropped from 4.7 to 2, and she received an overall rating of "needs improvement." None of SEC's performance evaluations procedures were followed in issuing the evaluation.

31. After Plaintiff Wilson was placed on detail to OHR, Hoecker reorganized OIG and removed Sullivan as the DIG, and assigned her oversight of the Administrative

Section. Hoecker apparently made Sullivan the DIG so she could issue Plaintiff Wilson a poor evaluation and force her from her position, and then reassigned Sullivan after Plaintiff Wilson was no longer in her position.

32. In February 2014, the Commission was going through a process to upgrade security clearances. Hoecker sent an email stating that it was a waste of government resources to update Plaintiff's security clearance because she would not be returning to the Office of the Inspector General. Thus, in February 2014, Hoecker had already made the decision that Plaintiff Wilson would not return to her position.

33. While Plaintiff Wilson was on detail to OHR from January 2014 to November 2014, she was not allowed to attend any OHR senior staff meetings. During this period, Plaintiff Wilson's detail was extended three times.

34. On November 16, 2014, Plaintiff Wilson was involuntarily transferred to OHR on a permanent basis. Plaintiff Wilson was removed from her position of supervisory auditor in OIG in the 0511 series, and reassigned to a less equivalent position as a branch chief in a non-professional 0343 job series which does not have a positive education requirement. Plaintiff Wilson was informed by her new supervisor that she was being transferred to OHR based on management's discretion. Plaintiff Wilson's retention bonus was terminated as well.

35. Plaintiff Wilson remains employed as a SK-17 in OHR, and her title is branch chief. All other branch chiefs in OHR are SK-15s. At that time, there was a Caucasian female in OHR who was a SK-17, and she reported to another SK-17, and the Caucasian female's position was Assistant Director.

36. When Plaintiff Wilson was transferred to OHR, her supervisor reviewed her salary and determined that Plaintiff Wilson's compensation was less than other employees at the SK-17 level. The Agency retroactively raised her salary in November 2014. The person who replaced Plaintiff Wilson was paid at least $30,000 more than what Plaintiff Wilson had been making when she was in the position for several years. Plaintiff Wilson was the lowest paid SK-17 in the OIG for several years. Plaintiff was one of the lowest paid SK-17 employees in an agency with several thousand employees, over many years, and male employees at the Agency at the SK-17 level and lower grades, who performed comparable or less work, received greater compensation than Plaintiff Wilson, during her employment at the Agency. In January 2013, the former interim Inspector General, John Rymer, wrote a letter attempting to get Plaintiff's salary increased, after he learned that Plaintiff was being underpaid. Mr. Rymer informed Plaintiff Wilson at the time that she was one of the five lowest paid SK-17 employees at the Agency.

37. The disparate treatment, hostile work environment, reprisal, and loss of her position have been harmful to Plaintiff's emotional well being and she has suffered significant physical and emotional illnesses from the stress the discrimination and reprisal has caused her.

**Count I**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e *et seq.***
***Race and Sex Discrimination***

38. Plaintiff incorporates by reference paragraphs 1 through 37 as if fully stated herein.

39. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.

40. At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

41. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

42. In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to disparate treatment and created a hostile work environment based on her race and sex by 1) subjecting Plaintiff to workplace harassment as detailed above; 2) hiring a younger, Caucasian female to perform Plaintiff’s duties and paying the Caucasian female $30,000 more in salary than Plaintiff; 3) issuing Plaintiff a false and poor performance evaluation in 2014; 4) extending Plaintiff’s detail in the Office of Human Resources on three occasions in 2014 and preventing Plaintiff from returning to her official position; 5) permanently reassigning Plaintiff to a non-professional series position in OHR; and 6) paying Plaintiff less in compensation than Caucasian and male employees who performed comparable duties.

43. As a result of such acts, Plaintiff has suffered damages.

**<u>Count II</u>**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e *et seq.***
***Retaliation***

44. Plaintiff incorporates by reference paragraphs 1 through 43 as if fully stated herein.

45. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual filed a complaint of discrimination.

46. At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

47. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

48. In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant knowingly and intentionally subjected Plaintiff to retaliation and a retaliatory hostile work environment after she complained about discrimination by 1) subjecting Plaintiff to workplace harassment as detailed above; 2) hiring a younger, Caucasian female to perform Plaintiff's duties and paying the Caucasian female $30,000 more in salary than Plaintiff; 3) issuing Plaintiff a false and poor performance evaluation in 2014; 4) extending Plaintiff's detail in the Office of Human Resources on three occasions in 2014 and preventing Plaintiff from returning to her official position; 5) permanently reassigning Plaintiff to a non-professional series position in OHR; and 6) paying Plaintiff less in compensation than Caucasian and male employees who performed comparable duties.
**<u>Count III</u>**
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 633a**
***Age Discrimination***

49. Plaintiff incorporates by reference paragraphs 1 through 48 as if fully stated herein.

50. The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age.

51. At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

52. At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

53. In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to discrimination and created a hostile work environment based on her age by 1) subjecting Plaintiff to workplace harassment as detailed above; 2) hiring a younger, Caucasian female to perform Plaintiff's duties and paying the Caucasian female $30,000 more in salary than Plaintiff; 3) issuing Plaintiff a false and poor performance evaluation in 2014; 4) extending Plaintiff's detail in the Office of Human Resources on three occasions in 2014 and preventing Plaintiff from returning to her official position; 5) permanently reassigning Plaintiff to a non-professional series position in OHR; and 6) paying Plaintiff less in compensation than Caucasian and male employees who performed comparable duties.

54. As a result of such acts, Plaintiff has suffered damages.

**Prayer for Relief**

Wherefore, Plaintiff prays as follows:

A. Issue a declaratory judgment that Defendant's practices toward Plaintiff were violative of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a;

B. Enjoin Defendant from discriminating against employees who report discriminatory practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

C. Award Plaintiff damages, including back pay and front pay and all lost benefits, and compensatory damages for emotional distress and hardship created by the Defendant's discrimination and retaliation;

D. Award payment of all fees, costs, expenses, including attorneys' fees and expert fees; and

E. Award Plaintiff such other relief as to which she may be deemed entitled.

**Jury Trial Demand**

Plaintiff demands a jury trial on all counts so triable.

Respectfully submitted,

David A. Branch #438764
Law Office of David A. Branch & Associates, PLLC
1828 L Street NW, Suite 820
Washington, DC 20036
(202) 785-2805 phone
(202) 785-0289 fax
davidbranch@dbranchlaw.com