# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**JACQUELINE WILSON**,

Plaintiff,

v.

Case No. 16-cv-133 (CRC)

**JAY CLAYTON**, **Chair of the Securities and Exchange Commission**,

Defendant.

## MEMORANDUM OPINION

Jacqueline Wilson, an employee of the Securities and Exchange Commission ("SEC"), has sued the agency. She alleges that it took discriminatory action against her in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act ("ADEA"), and that it retaliated against her for complaining about this alleged discrimination. With discovery closed, the SEC has moved for summary judgment. The Court will grant the motion.

## I. Background

### A. Factual Background

#### 1. Wilson's tenure in the SEC's Office of Inspector General

Wilson, an African-American woman now in her fifties, began working at the SEC in 2008 as Assistant Inspector General for Audits in the agency's Office of Inspector General ("OIG"). See Pl.'s Statement of Disputed Material Facts ("Pl.'s Facts"), ECF No. 23-1, ¶ 1. The position carried an SK-17 grade, the highest rung on the SEC's pay scale.[1] Def.'s Statement of Undisputed Material Facts ("SUMF"), ECF No. 21-1, ¶ 1. Wilson supervised six SEC auditors

---

[1] The SEC uses an "SK" pay scale rather than the "GS" scale used elsewhere in the federal civil service.

and several contractors.  See Pl.'s Opp'n. to Def.'s Mot. Summ. J. ("Opp'n") Ex. A, ECF No.

23-2, at SEC Bates No. 00076.

In February 2013, Carl Hoecker was hired as the agency's new Inspector General.

SUMF ¶ 2.  In his early months at OIG, Hoecker made several personnel moves relevant to this

case.  In June 2013, he advertised a job opening for a Deputy Inspector General and promoted

Mary Beth Sullivan, a white woman, to that position.  Deposition of Carl Hoecker, Def.'s Mot.

Summ. J. ("MSJ") Ex. 2 ("Hoecker Dep."), at 56:6–13.  Prior to Hoecker's tenure, Sullivan had

been reprimanded after an investigation in which Wilson cooperated.  Id. at 57:1–10.  In August,

Hoecker hired Paul Crane, a white man, as Assistant Inspector General for Investigations.

Hoecker had supervised Crane in a previous role and hired him without an interview.  Id. at

61:1–62:6.

Finally, in late 2013, Hoecker advertised a new position: Deputy Inspector General for

Audits, Evaluations, and Special Projects.  See MSJ Ex. 9, at SEC Bates No. 00152–57.  Like

Wilson's job, the new position was an SK-17 position that involved audit functions.  Id.  As

Hoecker tells it, he envisioned the role as helping supervise OIG audits, which he thought needed

improvement, and working on special projects and evaluations.  Hoecker Dep. at 76:7–15.  As

Wilson tells it, the job responsibilities were duplicative of hers.  See, e.g., Opp'n Ex. A at SEC

Bates No. 00081.  Sullivan and Crane were part of a three-person panel responsible for

reviewing applications and sending candidates to Hoecker for an interview.  Hoecker Dep. at

80:20–81:18; see also Affidavit of Carl Hoecker, MSJ Ex. 5 ("Hoecker Aff."), ECF 21-7, at SEC

Bates No. 00088.  Despite the fact that Wilson was on a "best qualified" list for the position, the

panel did not select her for an interview.  Hoecker interviewed three candidates and hired

Rebecca Sharek, a white woman. Hoecker Dep. at 87:16–91:6; see also Hoecker Aff. at SEC Bates No. 00088.

During Hoecker's first several months at OIG, he directly supervised Wilson and expressed dissatisfaction with her job performance. SUMF ¶ 2; see also Hoecker Dep. at 42:18–47:4; Hoecker Aff. at SEC Bates No. 00088; Deposition of Lacey M. Dingman-Woodsmall, Def.'s MSJ Ex. 4 ("Dingman Dep."), ECF 21-6, at 72:1–22. The parties tell different tales about whether this dissatisfaction was fair, what motivated it, and how intensely it was expressed. In Wilson's view, it was unwarranted, discriminatory, and sufficiently severe to constitute harassment. See Affidavit of Jacqueline Wilson, MSJ Ex. 1 ("Wilson Aff."), at SEC Bates No. 00077. When Sullivan was promoted to Deputy Inspector General, she became Wilson's supervisor. She, too, expressed dissatisfaction with Wilson's work in ways Wilson thought unfair, hostile, and retaliatory for Wilson's role in the prior investigation that had resulted in Sullivan's reprimand. Opp'n Ex. A at SEC Bates No. 00029, 00031. For example, Wilson recounts that Sullivan required daily check-ins, insisted on being copied on certain external emails, and unfairly criticized her work. Id.; see also Wilson Aff. at SEC Bates No. 00078. Crane was made part of a senior leadership team; Hoecker and Sullivan insisted that Wilson brief that team about certain aspects of her work. Hoecker Dep. at 70:20–72:5. Wilson detailed an incident in which Hoecker approved her presence at an off-site training but required her to leave the training early to attend in person a meeting that others were permitted to attend telephonically. Opp'n Ex. A at SEC Bates No. 00031. She found this "excessive and an abuse of Hoecker and Sullivan's authority to be fair and treat [her] as a senior official." Id. She also indicated that Hoecker met frequently with Crane and took Sullivan and Crane to certain meetings—opportunities she was not given. Id. at 00029. On November 15, 2013, Wilson

contacted the agency's equal employment opportunity ("EEO") office regarding Hoecker's treatment of her.  Id. at 00031.  She decided not to file a formal complaint at that time.

2.	<em>Wilson's Requests for Transfer</em>

In June 2013, several months into Hoecker's tenure and shortly after Sullivan began supervising her, Wilson contacted Erica Williams, the SEC Chair's Deputy Chief of Staff, to report a hostile work environment.  SUMF ¶ 3; Pl.'s Facts ¶ 3.  According to the SEC, she also asked for a transfer, SUMF ¶ 3; Wilson now disputes that, but she indicated in both her EEO narrative and her complaint in this case that she asked for help finding a new job.  See Opp'n Ex. A at SEC Bates No. 00029; Wilson Aff. at SEC Bates No. 00077; Compl. ¶ 21.

In any event, it is undisputed that shortly thereafter, Lacey Dingman, the SEC's Chief Human Capital Officer, called Wilson to discuss the possibility of a move.  According to Dingman, she approached the heads of two offices within the SEC for whom Wilson had expressed interest in working.  Dingman Dep. at 14:20–15:9.  After considering the possibility, both told Dingman that they would be unable to accommodate Wilson.  Id. at 15:12–19; see also Affidavit of Lacey Dingman, MSJ Ex. 7 ("Dingman EEO Aff."), at SEC Bates No. 00103 ("I had asked several of my colleagues in other organizations in the SEC about accepting her but they declined, because of the impact on their offices.  The substantive work they all do is substantially different from what the OIG does and they were concerned about accepting someone at her grade level into their organizations without competition.").  Wilson declined to take a demotion to an SK-16 position at that time.  Dingman Dep. at 21:19–22:22.

From Wilson's perspective, the situation at OIG further deteriorated, eventually leading to her November 2013 EEO activity.  Around that time, Wilson wrote to Jeffery Heslop, the SEC's Chief Operating Officer, to request a transfer.  She wrote that "[she] really need[ed] out of

4

OIG as soon as possible," and indicated that she was "open to accepting whatever open vacancies" were available within Heslop's office, including an SK-16 position. Def.'s Reply Supp. MSJ ("Reply") Ex. B, ECF No. 28-2, at 3; see also Deposition of Jeffery L. Heslop, MSJ Ex. 3 ("Heslop Dep."), at 12:1–9. She enclosed a resume, which Heslop forwarded to Dingman. Reply Ex. B at 3. Hoecker, too, spoke with Heslop regarding a temporary detail for Wilson. Hoecker Dep. at 105:10–106:22. He mentioned that Wilson had complained to the EEO office about him. Id. Wilson took leave towards the end of 2013 and, upon her return in January 2014, was offered and accepted a temporary 90-day detail to Dingman's department, the Office of Human Resources ("OHR"). Opp'n Ex. A at SEC Bates No. 00031.

### 3. Wilson's Temporary Detail

In OHR, Wilson worked in the Transportation, Supplemental Benefits and Special Program Branch of OHR's Total Rewards Group. Wilson Aff. at SEC Bates No. 00075. Her direct supervisor was Trinette Smith, also an SK-17 grade. Dingman testified that during Wilson's detail, she continued to reach out to other departments within the SEC in an effort to find Wilson a new permanent role but was unsuccessful in finding a position that suited Wilson's preferences. Dingman Dep. at 16:5–17:10; Dingman EEO Aff. at SEC Bates No. 00103.

During this period, in February 2014, the OIG was undergoing a process of updating security clearances. Kelly Gibbs, an SEC Personnel Security Specialist, emailed Wilson, indicating that Hoecker had informed her about Wilson's detail and that, because Wilson's OHR position did not require clearance, her background investigation would be canceled. Opp'n Ex. B, ECF No. 23-3, at P_0004. Wilson objected, noting that her "permanent position ha[d] not changed and [she was still] an OIG asset." Id. Gibbs responded that, based on the conversation

with Hoecker, Wilson "d[id] not need a clearance at [that] time" and that when she returned to OIG and needed a clearance, they would commence the investigation.  Id. at P_0002.

Around the same time, Sullivan submitted Wilson's performance evaluation for 2013, rating her a 2 out of 5—substantially lower than previous years' evaluations.  Declaration of Jacqueline Wilson ("Wilson Decl."), Opp'n Ex. C, ECF No. 23-4, ¶ 12.  Wilson appealed the evaluation through the SEC's grievance process on both procedural and substantive grounds.  See generally Reply Ex. C, ECF No. 28-3.  As part of the appeal, she claimed that the rating stemmed from discriminatory animus.  Id. at 2.  From March until September 2014, Wilson and the agency engaged in discussions to settle the grievance.  Wilson's detail was extended twice during these negotiations.  MSJ Ex. 8 at SEC Bates No. 00261–62.  In September, Wilson rejected the agency's settlement offer.  Her detail was extended twice more after that.  Id. at SEC Bates No. 00263–64.

### 4.    *Wilson's Permanent Transfer*

In November 2014, the agency permanently transferred Wilson to OHR.  MSJ Ex. 12 at SEC Bates No. 00268.  She remained, and continues to serve, in the position to which she had been detailed for the previous eleven months: a Supervisory Program Specialist, overseeing the Transportation, Supplemental Benefits and Special Program Branch of OHR's Total Rewards Group.  She remained an SK-17 employee and continued to report to Smith, an SK-17 as well.  In this position, Wilson supervises three employees.  Pl.'s Facts ¶ 25.  She indicates that she does not attend OHR management meetings.  Id.

Wilson's current position, unlike her previous one in OIG, does not have an educational requirement and involves limited auditing functions.  Id.  According to her EEO complaint, all other SEC employees with equivalent positions are at the SK-15 pay grade, lower than Wilson's

SK-17 grade.  Opp'n Ex. A at SEC Bates No. 00032.  Further, Wilson says that she is one of only two SK-17 employees in the SEC who reports to another SK-17 employee.  Id.

     *5.    Wilson's Salary*

When Wilson was hired in 2008, her initial salary was set at $128,805.  Affidavit of Lacey Dingman-Woodsmall, MSJ Ex. 13 ("Dingman Aff.") ¶ 5.  By 2014, she was paid $164,296, MSJ Ex. 14 at SEC Bates No. 00269, with a fifteen percent retention incentive.[2] Dingman Aff. ¶ 7; see also Dingman Dep. at 49:6–8.  The fifteen percent incentive was the highest percentage salary increase available at the agency.  Dingman Dep. at 46:2–4.  When Wilson was permanently transferred, her retention incentive was eliminated.  SEC policy allowed an employee to receive a retention incentive for a discrete period, subject to renewal. See Dingman Dep. at 49:20–22; Heslop Dep. at 38:21–40:17.  Dingman testified that Wilson's incentive expired during her detail but Dingman, in consultation with Heslop, extended the incentive until the permanent transfer in November 2014.  Dingman Dep. at 49:20–51:13; see also Dingman EEO Aff. at SEC Bates No. 00104.

In 2012, the SEC adopted a new policy for setting salaries for new hires and employees who transfer within the agency.  Dingman Dep. at 42:19–43:2.  Under this policy, the agency uses a salary matrix to determine compensation.  Id. at 41:4–17; see also Dingman Aff. ¶ 11; Affidavit of Jeffery Heslop, MSJ Ex. 16 ("Heslop Aff."), at SEC Bates No. 00096.  Upon the hiring of a new employee, an SEC compensation specialist makes a salary recommendation to a hiring manager based a new employee's experience and qualifications.  Dingman Dep. at 46:11–48:6.  The employee's hiring manager then provides additional information to justify a higher or

---

[2] It is not clear from the record whether the fifteen percent incentive was included in, or in addition to, the $164,296 salary figure.

lower amount, and Dingman reviews the recommendations and makes a final decision. <u>Id.</u> In making these assessments, the compensation specialist does not consider the salaries of existing SEC employees. <u>Id.</u> at 47:17–19. When Sharek was hired in 2014, her salary was determined pursuant to this policy. Dingman Aff. ¶ 13; <u>see also</u> Hoecker Dep. at 92:15–93:14; Heslop Dep. at 28:11–29:3. She was paid $195,000 per year. Dingman Aff. ¶ 13.

Because the SEC salary matrix did not apply to employees who were hired before 2012 unless they later transferred, Dingman Aff. ¶ 11, Wilson's salary was unaffected by the matrix-based policy for her entire tenure at OIG, including her temporary detail to OHR. When she was permanently transferred in November 2014, Wilson became eligible for a matrix-based salary readjustment. <u>Id.</u> This readjustment did not occur immediately upon her transfer, however. According to Smith, Wilson's supervisor who was responsible for processing the readjustment, she forgot to do so. MSJ Ex. 17 at SEC Bates No. 00109; <u>see also</u> Dingman Dep. at 71:3–22. After Wilson raised the salary discrepancy between her and Sharek in a January 2015 EEO complaint following the permanent transfer, Dingman and Smith applied the matrix to adjust Wilson's salary. MSJ Ex. 17 at SEC Bates No. 00109; <u>see also</u> Dingman Dep. at 69:8–70:10. Wilson's new annual salary was set at $203,871, an increase of approximately 24 percent. Attachment C to Dingman Aff. The raise was also made retroactive to Wilson's November 2014 permanent transfer. <u>Id.</u>; Dingman Dep. at 69:8–14.

B. <u>Procedural History</u>

Following her permanent transfer in November 2014, Wilson contacted an agency EEO counselor. This time Wilson filed a formal complaint. <u>See generally</u> Opp'n Ex. A at SEC Bates No. 00075–82. The EEO office concluded in an October 2015 Final Agency Decision that Wilson had failed to prove by a preponderance of the evidence that she had suffered

discrimination and issued her a right to sue notice.  See Mot. Dismiss Ex. D, ECF No. 11-4.  She

filed suit in this Court in 2016 alleging race and sex discrimination and retaliation in violation of

Title VII, and age discrimination in violation of the Age Discrimination in Employment Act

("ADEA").  Her Complaint identified six discrete acts supporting her claims: (1) workplace

harassment during her tenure in OIG; (2) her non-selection for the Deputy Inspector General

position for which Sharek was hired; (3) her February 2014 formal performance evaluation; (4)

her detail extensions; (5) her permanent transfer to OHR; and (6) her salary both as compared to

similarly situated white, male employees over her OIG tenure and relative to Sharek's starting

salary.  See Mem. Op. and Order, ECF No. 18, at 5–9.

The SEC moved to partially dismiss Wilson's Complaint as time-barred on the ground

that she had failed to exhaust administrative remedies for several of the discrete acts underlying

her claims.  The Court granted the motion in part, concluding that the only claims that Wilson

had properly exhausted stemmed from (1) her permanent transfer and (2) her salary relative to

Sharek's (but not relative to similarly situated white men during her tenure at OIG).  See

generally id.  Those two issues form the only remaining claims in the case.  In its opinion,

however, the Court noted that while the other acts alleged could not constitute separate claims,

Wilson would be able to marshal details of the other acts as evidence to support her remaining

claims, which she has attempted to do here.  Id. at 10 n.4.

Discovery has been completed and the SEC has moved for summary judgment,

contending that no reasonable jury could conclude that Wilson's permanent transfer or pay

relative to Sharek's resulted from discrimination or retaliation.  Wilson opposes that motion,

which is now ripe for the Court's review.

## II.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court must accept as true the nonmovant's evidence and draw all reasonable inferences in her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The nonmovant may not, however, rely on "mere allegations" or conclusory statements.  Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III.   Analysis

### A.   Legal Principles Underlying Wilson's Claims

Wilson contends that when the agency permanently transferred her to OHR and when it set Sharek's salary higher than hers, it did so for discriminatory and retaliatory reasons in violation of Title VII and the ADEA.  Where, as here, there is no direct evidence of discrimination or retaliation, the Court applies the three-step framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Giles v. Transit Employees Fed. Credit Union, 794 F.3d 1, 5 (D.C. Cir. 2015) (applying McDonnell Douglas framework to ADEA claims).

First, an employee must establish a *prima facie* case of discrimination or retaliation. Then, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory [and nonretaliatory] reason" for the employment action.  McDonnell Douglas, 411 U.S. at 802.  Third, the burden shifts back to the employee to rebut the employer's proffered reason "by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination" or retaliation.  Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014).  An employee may prove pretext using a variety of evidentiary sources, including

> the employer's better treatment of similarly situated employees outside [her]
> protected group, its inconsistent or dishonest explanations, its deviation from

established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

    B.  <u>Permanent Transfer</u>

          *1.*    *Discrimination Claim*

The SEC moves for summary judgment on Wilson's discrimination claim stemming from her permanent transfer. It contends first that Wilson has failed to make out a *prima facie* case of discrimination, <u>see</u> MSJ at 6–8, and second that, in any event, the agency has put forth a legitimate, non-discriminatory reason for her transfer, <u>see</u> <u>id.</u> at 9–11.

Ordinarily, when an employer seeking summary judgment offers legitimate, non-discriminatory reasons for a purported adverse action, courts move to the third prong of <u>McDonnell Douglas</u> and consider whether the employee has rebutted those reasons. <u>See, e.g.</u>, <u>Norris v. Wash. Metro. Area Transit Auth.</u>, 342 F. Supp. 3d 97, 109 (D.D.C. 2018). Here, however, because the parties emphasize the *prima facie* case, the Court will briefly address the matter. <u>See, e.g.</u>, <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (discussing whether employee had established *prima facie* case before assessing employer's non-discriminatory justification).

To establish a *prima facie* case of discrimination, Wilson must show that she is a member of a protected class, she suffered an adverse employment action, and "the unfavorable action gives rise to an inference of discrimination[.]" <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1130 (D.C. Cir. 2002). The agency contends that Wilson's permanent transfer was not an adverse action because it was a lateral transfer that did not entail "objectively tangible harm." MSJ at 7. "[T]ypical adverse actions in employment discrimination cases" include being "fired or denied a

job or promotion" or suffering "reductions in salary or benefits." <u>Baloch</u>, 550 F.3d at 1196. The D.C. Circuit has distinguished such harm from "purely subjective injuries" such as "dissatisfaction with a reassignment," "public humiliation or loss of reputation," or the "depriv[ation] of prestige." <u>Forkkio</u>, 306 F.3d at 1130–31.

Here, the SEC argues that Wilson's transfer was hardly adverse because it resulted in an *increase* in her pay of approximately $40,000 by making her eligible for salary readjustment under the agency's matrix-based pay policy. <u>See</u> Attachment C to Dingman Aff. Wilson responds that while her salary may have increased, the new position is less desirable: Her role does not require any specific educational background, has fewer supervisory responsibilities, and does not focus on auditing, her area of expertise. Pl.'s Facts ¶ 25. The D.C. Circuit has repeatedly held that a lateral transfer can constitute a materially adverse action if it yields significant shifts in responsibilities, and Wilson's transfer to a non-auditing position parallels changes that the Circuit has recognized as sufficient to constitute adverse action. <u>See, e.g.</u>, <u>Pardo-Kronemann v. Donovan</u>, 601 F.3d 599, 607–09 (D.C. Cir. 2010) (materially adverse lateral transfer when lawyer plaintiff shifted from legal to non-legal position). Likewise, Wilson supervises fewer individuals in OHR than she did in OIG. The Circuit has recognized that a reduction in supervisory duties can constitute a materially adverse action, albeit in contexts where the reduction was far more significant than what occurred here. <u>See e.g.</u>, <u>Czekalski v. Peters</u>, 475 F.3d 360, 364 (D.C. Cir. 2007). To be sure, any harm Wilson suffered from the shift in responsibility is at least partially counteracted by her salary increase. And while Wilson may have accepted a lower salary to keep her previous position, that subjective preference, in the face of a substantial salary bump, seems at the outer bounds of the "objectively tangible harm" Title

VII requires.[3]  Nevertheless, because Wilson's burden at the *prima facie* stage is "minimal,"

Hamilton v. Geithner, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (quoting Holcomb v. Powell, 433

F.3d 889, 903 (D.C. Cir. 2006)), the Court cannot confidently conclude that a reasonable jury

would be unable to find her permanent transfer to be materially adverse.

In any event, Wilson cannot defeat summary judgment because she has not shown the

agency's non-discriminatory reasons for the transfer to be pretextual.

### 2. The SEC's Proffered Justification for the Permanent Transfer[4]

The SEC has put forth a non-discriminatory, non-retaliatory justification for Wilson's

permanent transfer:  She asked to leave OIG, the agency accommodated her request by placing

her on an extended detail to OHR, the agency tried but was unable to find her another position

acceptable to her during that detail, and she did not want to return to OIG.  Dingman, Hoecker,

and Heslop all recount that, after a few months of working under Hoecker, Wilson sought to

leave OIG, and the agency facilitated the move.  Dingman Dep. at 14:9–12; Heslop Dep. at 12:6–

---

[3]  Also noteworthy in this context:  While it is undisputed that Wilson did not wish to remain at OHR, as discussed in more detail below, the record evidence indicates that she actively sought to avoid returning to OIG and there were no other positions available that suited her preferences.  Transfers that an employee actively seeks, of course, do not qualify as materially adverse actions.  See, e.g., Ramos v. Lynch, 267 F. Supp. 3d 39, 49–50 (D.D.C. 2017); Buie v. Berrien, 85 F. Supp. 3d 161, 179 (D.D.C. 2015).

[4]  Much of Wilson's briefing focuses on attempts to show dishonesty in Dingman's explanation to demonstrate pretext.  See Opp'n at 12–15.  Wilson makes this point in her discussion of both discrimination and retaliation, but it appears that Wilson treats Dingman's motive primarily as retaliatory rather than discriminatory.  See, e.g., id. at 13.  Wilson's discrimination claim, meanwhile, mentions Dingman's purportedly pretextual explanation, but focuses principally on Dingman as the innocent conduit of *Hoecker's* discriminatory animus under a cat's-paw theory.  See id. 14–17.  Because the SEC's proffered explanation and Wilson's attempts to rebut it as pretextual inform both her discrimination case and her retaliation case, the Court will analyze it here, when discussing discrimination.  It will then discuss Wilson's alternative cat's-paw theory before addressing her retaliation claim.

16:6; Heslop Aff. at SEC Bates No. 00096; Hoecker Dep. at 105:10–106:22. The SEC temporarily detailed her to OHR and extended the detail four times. See MSJ Ex. 8 at SEC Bates No. 00261–64. Dingman details in an affidavit and in deposition testimony that she sought to find an SEC position to Wilson's liking. Specifically, she contacted the heads of other departments within the SEC, including the Office of Financial Management and the Office of Compliance, Inspections and Examinations, to inquire whether Wilson could transfer into their departments. Dingman Dep. at 14:20–15:9; Dingman EEO Aff. at SEC Bates No. 00103; see also Heslop Dep. at 55:21–56:7. She sent Wilson's resume to these department heads. Dingman Dep. at 14:18–15:15; see also Dingman EEO Aff. at SEC Bates No. 00103. These attempts proved unsuccessful, however. After nearly a year and several extensions of Wilson's temporary detail, the agency decided to make her transfer permanent. Dingman testified that "[t]he reassignment occurred because we had been extending and extending and extending her detail and we still hadn't found anything sufficient, and she did not want to go back" to OIG. Dingman Dep. at 59:6–9; see also Heslop Dep. at 55:4–56:7 (Wilson "voluntarily wanted to leave the OIG. . . . I talked to Ms. Wilson. That's what she told me. . . . [T]here were efforts undertaken to look across the organization to see if there were positions available that aligned with her skills."); Heslop Aff. at SEC Bates No. 00096.

Wilson's efforts to cast the SEC's explanation as pretext for discriminatory or retaliatory animus fall short. First, she asks the Court to ignore Dingman's testimony because it is self-serving and thus should not be considered at the summary judgment stage.[5] But "evidence a

---

[5] Wilson also moved to strike an affidavit submitted by Dingman because it was not signed. See ECF No. 22. The Court denied the motion and permitted the agency to provide a signed version after the government explained that it inadvertently omitted Dingman's electronic signature from the affidavit. See July 2, 2018 Minute Order.

party proffers in support of its cause will usually, in some sense, be 'self-serving.'" Johnson v. Perez, 823 F.3d 701, 710 (D.C. Cir. 2016). Such testimony should be discredited only if it has been undermined "either by other credible evidence, physical impossibility[,] or other persuasive evidence that the [affiant] has deliberately committed perjury." Chenari v. George Washington Univ., 847 F.3d 740, 747 (D.C. Cir. 2017) (citation omitted). Wilson has provided no such evidence here.

Second, Wilson contends that, even if the Court were to consider Dingman's explanations, there is ample evidence to suggest that those explanations were pretextual. Principally, she contends that Dingman's narrative is false because Wilson was in fact willing to return to OIG and Dingman knew as much. Opp'n at 12–14. But the record does not indicate that Wilson was willing to go back to OIG, let alone that she expressed such a willingness to Dingman.

Wilson highlights several pieces of evidence that she claims show that Dingman knew of her willingness to return. As an initial matter, while Wilson's claims stem from her permanent transfer rather than her temporary detail,[6] the agency's reasons for the transfer rest in part on events leading to her detail, specifically Wilson's request to leave OIG. Wilson disputes elements of the agency's contention that *she* initiated her detail from OIG. She now says that her June 2013 contact with Erica Williams was "to report being subjected to a hostile work environment [and] not to request a transfer," Pl.'s Facts ¶ 3, and she implies that Hoecker was responsible for her detail, see Opp'n at 5, not that she requested it. But Wilson's initiation of the

---

[6] Recall that Wilson cannot bring a standalone claim based on her details because of non-exhaustion, but that she can use the detail as evidence in support of claims arising from her permanent transfer.

detail is plainly confirmed by her own words.  In her EEO narrative, Wilson wrote that in June

2013:

> I asked [Erica Williams] if she could assist me in finding a new job.  I gave her an
> overview of my skills and [she] asked me to send her my resume, which I did . . . .
> Williams stated she would have Lacy Dingham [sic], the OHR Director give me a
> call.

Opp'n Ex. A at SEC Bates No. 00029.

Wilson's EEO narrative also indicates that Dingman called her about a week later and

that Wilson told her that she "needed to move."  Id.  Similarly, Wilson's EEO complaint

indicates that she "recall[ed] calling Erica Williams . . . and . . . ask[ing] for a transfer out of the

OIG" in mid-to-late 2013.  Id. at SEC Bates No. 00077.  Likewise, in her Complaint in this

Court, Wilson pled that she asked Williams for "assistance in finding another job."  Compl. ¶ 21.

Nor can it be disputed that Wilson again sought a transfer several months later.  Her EEO

narrative indicates that in late 2013, she "contacted Jeff Heslop and asked to be transferred to"

his office and that Heslop offered her a position in OHR, which she perceived as a demotion.

Opp'n Ex. A at SEC Bates No. 00031.  She eventually accepted the detail to OHR in order to

leave OIG.  Id.  In a November 2013 email, Wilson complained to Heslop that she "really

need[ed] out of OIG as soon as possible" and indicated that "although [she was] a SK-17, [she]

would be willing to take a SK-16 position," and that she was "open to accepting whatever open

vacancies [Heslop's office] may have."  Reply Ex. B at 3.  In sum, despite her current litigating

position, Wilson's Complaint and her own contemporaneous accounts and emails make clear that

*she* sought to leave OIG and was willing to accept a demotion to do so, corroborating the

agency's account.[7]

---

[7]  Wilson emphasizes Hoecker's deposition testimony that he, too, spoke with Heslop
after her November 2013 EEO complaint, to suggest that *he* initiated the permanent transfer.

Beyond suggesting that the initial detail was not at her own behest, Wilson contends that Dingman knew she was willing to return to OIG and that Dingman's explanation is thus false, raising an inference of pretext. To this end, Wilson emphasizes that, throughout her detail, she "reminded other Agency employees that she was still an OIG asset and her permanent position was in OIG." Opp'n at 13. She highlights the January 2014 email exchange in which she objected to SEC security personnel's decision to "hold off on processing [the] re-investigation" of her security clearance until her return to OIG. Opp'n Ex. B at P_0004. True, Wilson referred to herself in this exchange as "an OIG asset" and a "permanent OIG employee." Id. at P_0004, 0002. But the exchange shows only that Wilson correctly asserted that she was an OIG employee on detail. It does not reflect whether Wilson actively sought to return to OIG, let alone whether she shared any such desire to return with Dingman. The exchange therefore says nothing about whether the agency's stated reason for Wilson's transfer—that she did not want to return to OIG and there were no other positions available—is false or pretextual.

Wilson highlights another email: On Friday, May 9, 2014, Sharek emailed Dingman advising that Wilson had contacted the OIG's office "th[at] afternoon and indicated that [Wilson would be] returning" to OIG the following Monday. Opp'n Ex. A at SEC Bates No. 00289. Dingman responded that she was "planning to extend [Wilson's detail]." Id. This, Wilson contends, undermines Dingman's contention that Wilson did not want to return to OIG. Not so. Again, there is nothing in the email that suggests that Wilson expressed a desire to return to OIG.

---

But, as discussed, the record plainly shows her repeated requests to leave. Further, Hoecker testified that Wilson indicated to him her desire to leave before any EEO activity, and that he said he would support her request; Wilson's Complaint in this case indicates that in June 2013, she spoke to Hoecker to request a transfer, Compl. ¶ 20, corroborating his account that he knew about and supported her desire to transfer before any EEO activity, see Hoecker Dep. at 105:13–15 ("She wanted to leave. I told her I would support her in that position. Then she filed an EEO complaint against me.").

The email amounts to an acknowledgment that Dingman knew Wilson contacted OIG to plan for a return because her temporary detail was expiring. But the record also contains an email from Wilson to her supervisor at OHR, Trinette Smith, dated two days earlier on May 7, 2014. In that email, Wilson wrote that she "would like to meet with [Smith] to discuss the possibility of extending [her] detail in OHR" due to "trepidation regarding returning to OIG," and asked for "an extended detail of approximately 60 additional days." Id. at SEC Bates No. 00124. In other words, just two days before Sharek's email to Dingman, Wilson clearly expressed to Smith a desire to extend her detail to OHR.

Moreover, after her detail was extended in May 2014, Wilson again indicated that she did not want to return to OIG. In a June 23, 2014 appeal in her ongoing administrative grievance, addressed to Dingman, Wilson wrote that she sought "a lateral transfer to another SEC office into a job that is commensurate with my skill set so that I will not have to return to OIG on June 27, 2014." Reply Ex. G at 8; see also id. at 7 ("If I return to OIG, I will not be treated fairly. . . . Therefore, I am seeking a lateral transfer[.]").

In sum, then, the record includes several contemporaneous and subsequent narratives by Wilson herself, as well as emails she sent, that undermine her present contention in this litigation that she was willing to return to OIG. And the evidence she invokes to the contrary does not indicate otherwise. One email, which nothing suggests Dingman saw, simply shows Wilson correctly noting that she was an "OIG asset"; another shows that she contacted OIG to plan for her return upon expiration of her temporary detail—but it was sent two days after Wilson affirmatively requested a renewed detail, which the agency granted. Neither email supports Wilson's contention that "Ms. Dingman was clearly well aware of Ms. Wilson's willingness to

return to the OIG," and, thus, that her explanation for the transfer was a pretext for discriminatory or retaliatory animus.  Opp'n at 13.

Nor does Dingman's acknowledgment that Wilson indicated that she did not want to remain at OHR raise doubts about Dingman's explanation.  Wilson relies heavily on Dingman's deposition testimony that Wilson "told [Dingman] numerous times that she was not interested in being in the Office of Human Resources because it was not within her career goals."  Dingman Dep. at 17:19–22.  Wilson frames this statement as showing that she "did not want to remain in OHR and was ready to return to the OIG."  Opp'n at 13.  But it shows nothing regarding a willingness to return to OIG; as explained above, the record evidence clearly indicates that Wilson did not wish to return.  And while Wilson correctly notes that this testimony demonstrates that Dingman knew Wilson did not want to remain permanently in OHR, that reveals nothing probative of pretext.  Neither Dingman nor any other agency official has ever suggested that Wilson was transferred to OHR because it was an ideal choice or that she wanted to work there.  Rather, all the evidence points to the conclusion that she was permanently transferred there because no other suitable options were available and she did not want to return to OIG.  Dingman's acknowledgement that Wilson was unhappy at OHR does nothing to undermine that legitimate explanation.

To the extent Wilson highlights this evidence to suggest that, if forced to choose between OIG and OHR, she would have returned to OIG, that still does not defeat summary judgment.  Wilson's subjective preference between these two ostensibly imperfect options is not enough to create a material dispute about whether Dingman's explanation was pretextual.  Even if Dingman were mistaken about Wilson's desire to return to OIG rather than stay at OHR, there is nothing in the record to suggest that Wilson relayed such a preference to her.  As detailed above, the

evidence suggests the opposite.  See, e.g., Brady v. Office of Sergeant at Arms, 520 F.3d 490, 496 (D.C. Cir. 2008) (in assessing proffered reason, the question is what the employer "*honestly and reasonably believed*").

### 3. *Cat's-Paw Discrimination*

Beyond attacking Dingman's explanation as a pretext for unlawful animus on her part, Wilson insists (somewhat inconsistently) that "[t]he evidence raises an inference that Mr. Hoecker, and not Ms. Dingman, caused [her] to be permanently transferred," and that "Ms. Dingman was merely carrying out Mr. Hoecker's decision when she permanently transferred" Wilson.  Opp'n at 15.  Her theory is that Hoecker wanted Wilson to leave so he could "create an all Caucasian senior team" and "directed OHR to transfer her elsewhere."  Id. at 16.

"Under a cat's paw theory of discrimination, an employer may be held liable for discriminatory acts by a direct supervisor—even where that supervisor is not the final decisionmaker[.]"  Morris v. McCarthy, 825 F.3d 658, 668 (D.C. Cir. 2016).  A plaintiff can prevail under this theory when: "[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action."  Id. (alterations in original) (quoting Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)).

The SEC contends that cat's-paw causation is absent here because Hoecker played no role in the decision to permanently transfer Wilson.  See Reply at 8.  But this appears to understate his involvement.  Hoecker himself acknowledged that he "receiv[ed] periodic updates from OHR."  Hoecker Aff. at SEC Bates No. 00089.  He also testified that he learned of the decision from Heslop or Dingman in advance and consented to it.  Hoecker Dep. at 111:21–112:19.  Dingman's account is similar.  In an affidavit, she indicated that she made the decision

to transfer Wilson "in consultation with Mr. Hoecker." Dingman EEO Aff. at SEC 00103. She further testified that she "coordinat[ed] with senior leadership," including Heslop and possibly Williams, Dingman Dep. at 58:15–22, and that at some point "conferred with" Hoecker because "it's only appropriate to speak with the supervisor when you're going to take a resource away from them," id. at 67:13–15. Dingman also indicated that while she transferred Wilson because Wilson "stated that she did not want to go back to OIG . . . [and] work for Mr. Hoecker," Hoecker also expressed that Wilson would do better elsewhere. See Dingman EEO Aff. at SEC Bates No. 00103; see also Dingman Dep. at 57:3–17.

To be sure, Hoecker's role appears more limited than the ordinary cat's-paw liability case. Typically, cat's-paw liability attaches when an unbiased decisionmaker relies on a biased supervisor's recommendation to take some disciplinary action. See, e.g., Staub, 562 U.S. at 421 (discussing scenario where an "independent investigation takes [a biased recommendation] into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified"); Walker, 798 F.3d at 1095–96 (considering situation in which supervisor "played an integral role in informing the disciplinary committee"). In Steele v. Mattis, for example, the D.C. Circuit found a material factual dispute about cat's-paw causation where an allegedly biased supervisor admitted that she attended meetings regarding the employee's termination and was "basically present in" discussions that led to "a decision made that maybe [the employee] was possibly not the best match for the organization." 899 F.3d 943, 951 (D.C. Cir. 2018). The facts here do not quite fit that scenario. Nevertheless, it appears as a factual matter that Hoecker played at least some role in the decision process.

But whatever role Hoecker played, there is substantial unrebutted evidence, recounted above, that Dingman transferred Wilson because of Wilson's own resistance to returning to OIG

and Dingman's inability to find a position to Wilson's liking in another department. Given this evidence, the Court questions whether a reasonable jury could conclude that Hoecker's limited involvement was a proximate cause of Dingman's decision to permanently transfer Wilson. See, e.g., Morris, 825 F.3d at 672 (explaining that cat's-paw liability cannot attach when there is "superseding cause—that is, a 'cause of independent origin that was not foreseeable'" (quoting Staub, 562 U.S. at 420)); Duncan v. Johnson, 213 F. Supp. 3d 161, 193 (D.D.C. 2016) ("[T]he Supreme Court also made clear that a plaintiff cannot make out a claim if the impartial decision maker makes an independent determination that adverse action is warranted for reasons 'unrelated to the [non-decision maker's] original biased action.'" (quoting Staub, 562 U.S. at 421)). The parties have not briefed whether Dingman's explanation constitutes a superseding or independent cause for Wilson's transfer. The Court therefore declines to decide whether Hoecker's role in the decision process was sufficient to submit the proximate cause question to a jury.

Even assuming that Hoecker's input, rather than Wilson's own repeated requests to transfer, did somehow influence Dingman's decision to make the OHR position permanent, Wilson has failed to adduce evidence that his purported involvement—expressing the view that Wilson had the potential to be more successful elsewhere or consenting to the transfer—was motivated by discrimination. Thus, even if a jury could reasonably conclude, *arguendo*, that Hoecker's activity was a proximate cause of Wilson's permanent transfer, there would be no reasonable basis on which it could attribute his activity to discriminatory animus, as required to support a cat's-paw theory of liability.

Dingman indicated that Hoecker thought "Wilson had performance issues in her former OIG auditor role and that she had the potential to be more successful in a different position."

Dingman EEO Aff. at SEC Bates No. 00103.  The record does not suggest that this view was pretextual such that a reasonable jury could infer racially discriminatory animus.  For example, in challenging the low performance evaluation that she received from Mary Beth Sullivan, Wilson's own narrative of Hoecker's early days at OIG recounts that she spoke with him about delaying the release of two audit reports requested by Congress.  See Reply Ex. C at 3, 6–7.  And Wilson's evaluation grievance did not dispute that OIG had to extend the deadlines for those two reports; it contended, rather, that the delay was out of her control.  Id. at 3–7.  Regardless of Wilson's relative fault in the delay, Hoecker's concerns about Wilson's performance are not so unfounded as to give rise to an inference of discrimination in the absence of contrary evidence in the record.

Wilson highlights several categories of evidence that she contends do give rise to such an inference.  First, she notes that Hoecker has had four other EEO complaints filed against him, as he acknowledged in his deposition.  Hoecker Dep. at 9:11–18.  Yet the D.C. Circuit has rejected the notion that "the mere filing of . . . informal discrimination complaints against [an individual accused of animus], where nothing more is known about the nature, merit, or outcome of those complaints, can be used as a proxy to establish . . . discriminatory animus in the present case." Holcomb, 433 F.3d at 899–900.  Here, the record is bereft of any indication of the nature or merits of the other complaints against Hoecker.[8]

_____

[8]  Moreover, in Holcomb, the plaintiff and the other complainants were all African-American. Here, by contrast, while Wilson is African-American, the record indicates that two of the other complainants are white, one is Hispanic, and one is Asian-American.  Hoecker Dep. at 11:2–14:22. Thus, any inference that might be drawn from the mere filing of these complaints is weaker than it was in Holcomb in that it would require a jury to conclude a broad-ranging animus that included white employees.  In any event, Holcomb makes clear that the existence of complaints alone does not suffice to send the issue to a jury.

Second, Wilson emphasizes Hoecker's promotion of Mary Beth Sullivan and hiring of Paul Crane and Rebecca Sharek, each of whom is white, to suggest that Hoecker acted to "stack[] his senior positions with younger Caucasian employees." Opp'n at 16. But other than this conclusory speculation, she has provided no evidence to support a reasonable inference that race or age played any role in these decisions. In the ordinary course, when a plaintiff challenges her non-selection for a position as discriminatory, she must adduce evidence that she was substantially more qualified that the selected candidate. "[T]he qualifications gap must be great enough to be inherently indicative of discrimination." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007). Here, Wilson did not compete with Sullivan or Crane for their jobs, but the same principle obtains: To contend that Hoecker selected Sullivan and Crane because they were white, Wilson must provide some basis for a reasonable jury to conclude that they were so patently unqualified for their jobs as to give rise to reasonable inference of something invidious.

She has not done so. Wilson points to the fact that Sullivan had been investigated and reprimanded in the past and that Crane was hired without an interview. But Hoecker testified that the previous Inspector General had resolved the issue with Sullivan so it did not enter his calculus, Hoecker Dep. at 56:22–57:7; and Crane had previously worked under Hoecker, id. at 62:4–6. Regardless of the relative wisdom of these decisions, the judiciary cannot sit as a "super-personnel department that reexamines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999). Thus, courts "must assume that a reasonable juror who might disagree with the employer's decision . . . would not usually infer discrimination[.]" Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc).

Little here suggests that either decision was so problematic as to give rise to an inference of discriminatory intent.[9]

So, too, with Hoecker's selection of Sharek. Wilson has presented no evidence to show that she was so much better qualified than Sharek that a reasonable jury could conclude discriminatory motive. To the contrary, in her EEO narrative, Wilson indicated that Sharek's "background and qualification [were] very similar to her own." Opp'n Ex. A at SEC Bates No. 00031. And while Wilson was placed on a "best qualified" list for the position but was not interviewed, she has not provided any evidence that she was more qualified than the three candidates who were.

In pursuing the cat's-paw theory, Wilson provides a third category of evidence that she says raises an inference that Hoecker harbored discriminatory animus: his criticism of her for "incredulous reasons." Opp'n at 16. This inference is warranted, Wilson suggests, because Hoecker's criticisms were "diametrically at odds with five years of exceptional reviews." Id. But "it is well established that a drop in performance rating does not, without more, give rise to an inference of discrimination." Ramseur v. Perez, 80 F. Supp. 3d 58, 73–74 (D.D.C. 2015), aff'd, No. 15-5092, 2015 WL 5210307 (D.C. Cir. Aug. 6, 2015). Especially so where, as here, the criticisms at issue occurred during a period distinct from any previous performance evaluations. See, e.g., id. Here, departure from past performance ratings is even less probative of

_____

[9] Wilson's emphasis on the fact that Sullivan had scant auditing experience is likewise unavailing. Wilson contends that a jury could infer impermissible intent in part because Hoecker "claim[ed] that Ms. Sullivan was qualified to supervise Ms. Wilson because Ms. Sullivan's first job decades ago involved auditing." Opp'n at 16. But this misstates the record. Hoecker never stated that he promoted Sullivan *because* of that experience, but merely noted that she had it when asked. There is nothing in the record that suggests that the Deputy Inspector General position to which Sullivan was promoted dealt primarily with auditing functions. Thus, her relative inexperience in auditing is probative of nothing. See Hoecker Dep. at 59:21–60:3, 64:9–68:20 (discussing Sullivan's role as supervisory and revising and helping plan Wilson's work).

anything invidious.  First, Wilson's supervisor changed and Hoecker may have had different

expectations or standards than his predecessors.  Second, informal verbal feedback or criticism

based on individual incidents is different than written evaluations based on longer-term

performance.[10]  Third, as noted, the record reflects some basis for Hoecker's concerns, including

the delay of two congressionally requested audits.  See Reply Ex. C at 3–7.

Finally, to the extent Wilson points to hostility as the source of Hoecker's criticism of her

work and probative of discriminatory animus, the incidents she recalls, "i.e., rude comments,

unjust criticism, and stressful working conditions, amount to 'ordinary tribulations of the

workplace[.]'"  Richard v. Bell Atl. Corp., 209 F. Supp. 2d 23, 35 (D.D.C. 2002) (internal

citation omitted); see also Barbour, 181 F.3d at 1348–49.  Title VII "does not set forth

'a general civility code for the American workplace.'"  Baloch, 550 F.3d at 1199 (quoting

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The conditions Wilson

describes could not sustain their own hostile work environment claim, nor are they probative of

any animus to support her cat's-paw theory.

In sum, Wilson had not adduced sufficient evidence to support a cat's-paw theory.  The

reasons for the transfer are clear from the record:  Wilson did not wish to return to OIG and the

agency was unable to find her another position.  Even assuming, _arguendo_, that a reasonable jury

could conclude that Hoecker somehow influenced the permanent transfer, there would be no

basis to find discriminatory animus on this evidentiary record.

---

[10]  It bears noting that Wilson did receive a poor formal evaluation from Mary Beth
Sullivan.  Because she emphasizes Hoecker's informal feedback as part of her suggestion that his
criticisms were pretextual, the Court's analysis focuses on those incidents.  In any event, a
negative formal performance review is likewise not probative of discriminatory animus where, as
here, it examines a different period and was prepared by a different supervisor.

Wilson also contends that the permanent transfer was retaliatory.  Both Title VII and the ADEA "prohibit the federal government from retaliating against employees who complain of employment discrimination."  Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII); see Baloch, 550 F.3d at 1198 (ADEA).  Like her discrimination claim, Wilson's retaliation claim is governed by the three-step McDonnell Douglas framework.  To establish a *prima facie* case of retaliation, Wilson must show (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) that a causal link connects the two. Bernanke, 557 F.3d at 677.  In this context, "materially adverse action" has a different meaning than in the discrimination context.  A retaliatory action is "materially adverse" if it could "well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57.  For retaliation claims, the purported retaliatory motive must be a "but-for" cause of the adverse action.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).  As with the discrimination claim, the SEC moves for summary judgment, contending that Wilson has neither established a *prima facie* case of retaliation nor rebutted the agency's non-retaliatory explanation for her permanent transfer.

First, the *prima facie* case.  The SEC contends that Wilson's permanent transfer occurred too long after her protected activity—the EEO complaint against Hoecker—to give rise to an inference of causation.  MSJ at 15–16.  Wilson first contacted an agency EEO counselor to complain about Hoecker in November 2013, Opp'n Ex. A at SEC Bates No. 00031, and was not permanently transferred until a year later in November 2014, MSJ Ex. 12 at SEC Bates No. 00268.  Wilson responds that the temporal proximity is irrelevant because Dingman retaliated against her at the "first available opportunity," delaying the retaliation pending completion of her

settlement negotiations with the agency.  Opp'n at 11.  But these settlement discussions did not

deal with the November 2013 EEO complaint; rather, they dealt with a February 2014

performance review in which she received a negative evaluation.  Wilson Decl. ¶¶ 12–13.  On

March 6, 2014, Wilson filed a grievance challenging the review.  See generally Reply Ex. C.

Wilson does not explain why, if the permanent transfer was retaliatory for her EEO

activity, it did not occur in the months between that activity and the commencement of

discussions to settle a distinct grievance process, let alone why Dingman gave her the very detail

she sought.  While there is no bright-line rule, the D.C. Circuit has suggested that in the absence

of specific facts probative of causation, three months reflects the outer bounds of an appropriate

retaliation inference based on temporal proximity alone.  See Hamilton, 666 F.3d at 1357–58

(rejecting three-month bright-line rule but emphasizing need to "evaluate[] the specific facts" of

such cases); see also Walker, 798 F.3d at 1093 ("reject[ing] as 'untenable' 'an inference of

retaliatory motive based upon the mere proximity in time' between an employee filing a lawsuit,

and discipline . . . two and one-half months later" (quoting Taylor v. Solis, 571 F.3d 1313, 1322

(D.C. Cir. 2009)).  There is no basis to reset the clock in March 2014 and pause it pending

settlement discussions about a wholly separate grievance, in support of the notion that the

November 2014 transfer occurred at the "first available opportunity" after the November 2013

EEO complaint.  Moreover, Wilson's detail was twice extended following her rejection of the

settlement.  She does not explain how, in the face of this evidence, a jury could conclude the

agency retaliated at the "first available opportunity."

At other times in her briefing, Wilson indicates that the transfer was not retaliation for her

November 2013 EEO complaint, but rather for her September 2014 rejection of the settlement

offer concerning her performance evaluation grievance.  See Opp'n at 12.  That grievance

focused largely on challenging the merits of the evaluation rather than the alleged hostility and disparate treatment that formed the basis of Wilson's EEO complaint. See generally Reply Ex. C. It did, however, include a single reference to discrimination. Id. at 2. "It is well settled that Title VII protects informal, as well as formal, complaints of discrimination." Richardson v. Gutierrez, 477 F. Supp. 2d 22, 27 (D.D.C. 2007). That principle notwithstanding, it is far from obvious that protected activity encompasses settlement negotiations over a performance evaluation to which an employee objects, merely because she makes passing reference to discrimination. Nevertheless, because the SEC does not appear to contend that rejection of the settlement was not protected activity, see Reply at 9–10 (focusing on causation aspect of *prima facie* case), the Court will assume the existence of a *prima facie* case.

Even then, Wilson cannot defeat summary judgment. As with the discrimination claim, the agency attributes the permanent transfer to Wilson's desire to leave OIG, its inability to find a suitable position during her detail, and her unwillingness to return to OIG. Thus, the burden shifts to Wilson to prove it pretextual.

In this third step of the framework, temporal proximity is again relevant because it can serve as circumstantial evidence that an employer's proffered justification is pretextual. But the D.C. Circuit has repeatedly instructed that "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." Hamilton, 666 F.3d at 1359 (quoting Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007)). Here, Wilson's retaliation claim suffers the same fate as her discrimination claim. The Court will not rehash its prior discussion. It suffices to say that, as catalogued above, Wilson's insistence that Dingman knew that she was willing to return to OIG is unsupported by the record—in fact, it is

contradicted by substantial evidence of Wilson's own words that she resisted a return.  See supra Part III.B.2.

A few additional points bear discussion in the retaliation context, however, to address evidence that Wilson marshals.  First, Wilson emphasizes the aforementioned May 9, 2014 email from Sharek to Dingman indicating that Wilson had contacted OIG to plan for her return upon conclusion of her detail.  Dingman responded that she planned to extend Wilson's detail.  She added:

> We planned to communicate that to her this afternoon but were hopeful that she would be getting back to us on her settlement agreement (which she had promised we would have by this afternoon and we wanted to apply a little bit of pressure to get the settlement agreement in hand).

Opp'n Ex. A at SEC Bates No. 00289.

Wilson maintains that Dingman's response reveals retaliatory intent: the temporary details were designed to pressure her to accept a settlement and, once that prospect fell through, the permanent transfer was undertaken in retaliation.  Opp'n at 13.  At first blush, Dingman's reference to "apply[ing] a little bit of pressure" on Wilson might appear problematic.  In context, however, the email does not bear the weight Wilson places on it.  Recall that two days earlier, Wilson emailed Trinette Smith seeking to extend her detail with OHR because she did not want to return to OIG.  See Opp'n Ex. A at SEC Bates No. 00124 (Wilson informing Smith that she would like "an extended detail of approximately 60 additional days" due to "trepidation regarding returning to OIG").  Wilson consistently sought to avoid returning to OIG, and explicitly requested a detail extension on May 7, 2014 to prevent an imminent return.  Against that backdrop, the only reasonable conclusion is that Dingman's plan to "apply . . . pressure" involved delayed notification of approval of Wilson's request for a detail extension.  In other words, while Wilson maintains that the email shows Dingman extended her detail as retaliation,

reading it in light of the whole record illuminates quite the opposite: any pressure came from *not* extending the detail, rather than extending it.  And that undermines Wilson's contention that this email is probative of retaliation in the eventual permanent transfer months later.  If anything, the email, viewed in context, shows that Dingman earnestly believed that Wilson *did not* want to return to OIG—complementing the substantial evidence showing that Wilson repeatedly expressed as much.

Second, Wilson suggests that her permanent transfer was the "inevitable result" of retaliatory action Hoecker took after learning of her EEO complaint, Opp'n at 13–14—again implying that Hoecker, rather than Dingman, had the invidious animus that informed the permanent transfer.  In this context, she contends that "[o]nce Mr. Hoecker discovered that Ms. Wilson filed an EEO complaint against him, he told his superiors . . . and requested that she be detailed to another office."  Id. at 13.  As the Court has described, despite Wilson's suggestion otherwise, the record makes plain that *she* repeatedly requested a detail, and initially did so before she engaged in any EEO activity.  See supra Part III.B.2.  She cannot now elide that fact to suggest that Hoecker's consent to her detail is probative of animus.

Wilson also points to the February 2014 incident regarding her security clearance.  Recall that, after speaking with Hoecker, SEC personnel security officials cancelled a planned investigation for Wilson's security clearance.  According to Wilson, this shows that "[b]y February 2014, it was clear that Mr. Hoecker did not plan to allow [her] to return to OIG."  Opp'n at 13.  Elsewhere, she suggests that this was an effort to make it impossible for her to return.  Id. at 16.  But the emails do not show as much.  Kelly Gibbs, the personnel security specialist, wrote Wilson: "When you return to OIG and need a clearance, we can read you in . . . .  You will not need to wait for the investigation to close before being granted the clearance."

Opp'n Ex. B at P_0002. Nothing in the emails is probative of a plan by Hoecker to prevent Wilson's return, let alone to make it impossible; to the contrary, the emails anticipate a possible return. Wilson thus falters in contending that the permanent transfer was an "inevitable result" of Hoecker's ostensibly retaliatory actions nine months earlier.

Finally, Wilson emphasizes Dingman's acknowledgement that Hoecker thought Wilson might be more successful elsewhere. Dingman EEO Aff. at SEC Bates No. 00103. As discussed above, the record includes evidence that shows Hoecker's view had some basis: two congressionally requested audit reports were delayed. And while Dingman also indicated that the "IG's office didn't think that she would be in a good position to come back because she had raised concerns working there," Dingman Dep. at 57:6–8, to prevail on a retaliation claim, Wilson must prove that retaliation was a "but-for" cause of her permanent transfer. In other words, she must show that transfer "would not have occurred absent the retaliatory motive." Guerrero v. Vilsack, 134 F. Supp. 3d 411, 427 (D.D.C. 2015). No reasonable jury could consider Wilson's request to leave OIG and her repeated insistence that she did not want to return and conclude that the transfer would not have occurred absent Hoecker's opinion, let alone absent some retaliatory motive underpinning that opinion.

In sum, Wilson has been unable to rebut the agency's explanation of her permanent transfer or otherwise adduce evidence that could form the basis of a jury verdict that it was discriminatory or retaliatory. The SEC is therefore entitled to summary judgment on her claims stemming from that incident.

## C. Pay Disparity

Wilson has also alleged that her pay was discriminatory and retaliatory because Sharek, a younger white woman, was better compensated for doing substantially similar work. Here, as it

is undisputed that Sharek was indeed paid more than Wilson, the SEC does not challenge Wilson's *prima facie* case. Rather, it moves for summary judgment on the basis that Wilson cannot rebut its non-discriminatory, non-retaliatory reason for the discrepancy.

The SEC explains that Wilson and Sharek's salaries were set through different means as a result of when they were hired. Wilson was hired in 2008, before the SEC began using a salary matrix to determine compensation based on experience. Dingman Dep. at 41:4–43:2. Sharek, meanwhile, was hired in 2014, two years after the agency began using the matrix. Her salary was therefore set pursuant to the matrix. Dingman Aff. ¶ 13. In other words, according to the SEC, the disparate pay had nothing to do with any protected characteristic or retaliatory animus but rather was a consequence of a change in how the SEC set salaries for new hires.

Wilson offers no evidence to suggest that this explanation is pretextual. She laments that the agency did not provide the salary matrix itself as evidence in its favor, Opp'n at 17, but does not dispute its existence or otherwise call into question the veracity of the record evidence that (1) she was hired before the SEC adopted the matrix; (2) upon its adoption, the matrix was the basis for setting salaries for new hires, but did not apply retroactively; or (3) Sharek was hired after the adoption of the matrix, meaning her initial salary was properly set under the policy.

Instead, Wilson suggests that the policy itself is discriminatory. Opp'n at 17–18. She points to Heslop's acknowledgement of a "fair amount of inequity among SEC employees from a salary perspective" prior to 2014, Heslop Dep. at 28:8–9, and suggests that the agency acted discriminatorily by adopting a policy that aggravated this inequity to the detriment of older workers. At the outset, Wilson never raised this contention vis-à-vis Sharek's salary prior to her

opposition to summary judgment.[11]  In her Complaint and throughout this litigation, she has advanced a singular theory: that the SEC acted with discriminatory and retaliatory animus in paying *her* less than *Sharek*.  Nothing in her pleadings indicates a challenge to SEC *policy* itself.

Further, even if the Court were to accept her newfound contention at this late stage, Wilson has not provided any basis for a finding of discrimination.  She asserts that the policy benefitted younger employees in a discriminatory way, but there is nothing in the record to suggest as much: no data regarding the percentage of new hires in the early stages of their careers; no information about the age of those whose tenure began before the policy was enacted; no comparators between the two groups.  See Aliotta v. Bair, 614 F.3d 556, 565 (D.C. Cir. 2010) (to show disparate impact under the ADEA, a plaintiff can "offer statistical evidence of a kind and degree sufficient to show the employment decision disproportionately impacts older employees").  In the absence of any such evidence, Wilson would essentially invite a jury to speculate about the policy's effect on older employees with no basis on which to make a reasoned judgment.  Even if her current theory did conform to her pleadings, she would be unable to withstand summary judgment without more evidence in the record.

Wilson also advances another theory to survive summary judgment: that the agency was on notice of the pay disparity and failed to take action to correct her inadequate pay.  Opp'n at 18.  To this end, she notes that the agency knew her salary was low relative to other SK-17 employees and suggests that it should have acted accordingly.  Id.  But that contention does not call into question the SEC's adherence to its salary-setting policies as the non-discriminatory explanation for any salary discrepancy between Wilson and Sharek.  Nor is it probative of any

---

[11]  As discussed, Wilson's Complaint alleged that, while at OIG, she was paid less than white, male, similarly situated colleagues, but that claim was dismissed as not exhausted.  Thus, the only salary claim that remains regards her salary compared to Sharek's.

discriminatory or retaliatory animus in not taking affirmative steps to increase her salary. Indeed, the very basis for Wilson's contention that the SEC was "on notice" of the pay disparity is the fact that the SEC took every step available under its policy to correct the disparity. Prior to any of the events that led to this suit, the agency gave Wilson a "retention incentive" that increased her salary fifteen percent. Dingman Aff. ¶ 7. Dingman's unrebutted deposition testimony indicates that this was the only mechanism available to increase Wilson's salary, that the fifteen percent increase was the maximum permissible upward adjustment, and that the adjustment was extended for longer than usual while Wilson was detailed to OHR. Dingman Dep. at 46:2–4. Wilson provides nothing to suggest that the failure to increase her salary was motivated by any discriminatory or retaliatory animus.

Wilson's final point on this issue is that the SEC, for all its reliance on the salary matrix, failed to follow its policies upon her permanent transfer. Opp'n at 18. She notes that the SEC did not readjust her salary immediately upon the transfer, but rather did so only after she raised the issue in her EEO complaint. This, Wilson insists, raises an inference of something untoward. Recall that upon Wilson's transfer, Trinette Smith, her immediate supervisor, was responsible for initiating the salary readjustment. Dingman Dep. at 71:3–13. Smith has indicated that she forgot to do so. MSJ Ex. 17 at SEC Bates No. 00109; see also Dingman Dep. at 71:3–13. Wilson, meanwhile, acknowledges that she never raised the salary issue with Smith—the person responsible for its processing. Wilson Decl. ¶ 15. "An employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996), as amended on denial of reh'g (July 15, 1996) (quoting Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982)). And at no point during this

case has Wilson suggested that Smith held discriminatory or retaliatory animus towards her. To the contrary, Wilson indicates that the failure to raise her salary was *Dingman's* decision and is probative of *Dingman's* retaliatory animus. Opp'n at 18.

These facts also undermine Wilson's insistence that a reasonable jury could "infer that Ms. Dingman's explanation [about the delayed raise] is beyond credence as . . . she remember[ed] to terminate Ms. Wilson's retention incentive" upon permanent transfer. Id. True, it is undisputed that once the SEC permanently transferred Wilson, her retention incentive was removed immediately, while her raise was delayed. But each adjustment resulted from wholly distinct processes.

Dingman and Heslop explained that the SEC's retention policy expires after a period of time and an employee must reapply. Dingman Dep. at 45:10–18; Heslop Dep. at 40:10–17. Further, the incentive is not an entitlement, but is available only if the employee provides evidence of a competing job offer. See Dingman Dep. at 45:5–9; Heslop Dep. at 39:9–40:3. In this instance, Wilson's incentive expired during the summer of 2014 and she did not qualify for renewal under these policies. Dingman Dep. at 49:20–51:13. Wilson has provided no evidence to suggest that she sought renewal or that she provided the necessary evidence to justify it. Dingman testified that, in consultation with Heslop, she decided to maintain the incentive during Wilson's temporary detail until her permanent status was resolved. Id. Thus, that Dingman remembered to remove the expired retention incentive upon Wilson's permanent transfer does not undermine the explanation that the broader salary readjustment was overlooked; Smith, not Dingman, was responsible for the readjustment.

Finally, the record indicates that, once Wilson's supervisors were reminded that the policy called for a readjustment, they recalculated her salary pursuant to the matrix and made the

raise retroactive to the date of her permanent transfer.  There is simply nothing in the record to suggest that the delay in processing the raise was due to anything other than an administrative oversight, let alone retaliatory or discriminatory animus.  Cf. Perry v. Clinton, 831 F. Supp. 2d 1, 21 (D.D.C. 2011) (rejecting Plaintiff's contention that purported use of the wrong standard was probative of animus in the absence of any evidence of intentional wrongdoing).

As with her permanent transfer, Wilson has not presented evidence to rebut the agency's benign explanation for the salary discrepancy between her and Sharek.  As a consequence, no reasonable jury could conclude that the discrepancy was discriminatory or retaliatory.  The SEC is therefore entitled to summary judgment.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  April 27, 2019